**STATE of Missouri, Respondent,**

v.

**John LaDean THOMS, Appellant.**

**No. 16110.**

Missouri Court of Appeals,
Southern District,
Division One.

Dec. 19, 1989.

S. Dean Price, Asst. Public Defender, Springfield, for appellant.

William L. Webster, Atty. Gen., Robert V. Franson, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Presiding Judge.

A jury found John LaDean Thoms ("defendant") guilty of two counts: attempting to steal a motor vehicle, §§ 564.011[1] and 570.030, and having methamphetamine under his control, § 195.020. The jury assessed punishment at two years' imprisonment on the first count and five years' imprisonment on the second. The trial court imposed those sentences, ordering that they run concurrently.

Defendant appeals, maintaining the trial court erred in denying defendant's pretrial motion to suppress as evidence a bottle containing the methamphetamine, and in receiving the bottle and its contents in evidence over defendant's objection at trial.

---

1. References to statutes are to RSMo 1986.

Ricky Staples testified that a week or two prior to June 30, 1988, he placed a "For Sale" sign bearing his address in his 1969 Ford pickup and parked it on a shopping center parking lot in Marshfield. Staples locked the doors with a key—the only way to do it as the "knobs" in the doors that are normally pushed down to lock the vehicle had fallen "down in that little hole."

On June 30, 1988, a few minutes after noon, Staples was riding past the shopping center with his cousin when he noticed a man inside his pickup. Staples and his cousin drove onto the parking lot to investigate.

The man, identified by Staples at trial as defendant, had the ignition switch of Staples' pickup in his hand. Staples asked defendant if he was interested in buying Staples' pickup. Defendant, according to Staples, pointed to another man standing nearby and stated the pickup belonged to him. Defendant explained to Staples that he (defendant) "was taking some numbers and stuff down there." Staples noticed that the man to whom defendant pointed had a gun "poked down in his britches."

Asked what he told defendant, Staples replied, "I told him that it was my truck." Staples instructed his cousin to go get Staples' father and the title to the pickup.

Staples told defendant to put the ignition back together. About that time an acquaintance of Staples, Allen Dudley, was leaving a store at the shopping center. Dudley saw Staples and defendant, so he stopped. Dudley observed defendant with the ignition of Staples' truck in his hand "trying to put it back in." Staples, according to Dudley, was "mumbling about somebody trying to steal his truck."

Staples testified that during the two or three years he had owned the pickup he had painted it, installed bucket seats, put in carpet, cut the shifter down and mounted a knob on it, replaced the steering wheel with a sport steering wheel, put in a stereo, added clearance lights, and changed the wheels to five-spoke models. Staples asked defendant whether the other man's pickup was similar in all those respects.

Defendant, according to Staples, replied, "I guess."

Dudley recalled the other man stating his truck was like Staples' truck "[t]o the exact tee."

Staples' father, Lawrence, arrived at the scene and inquired of defendant why he had not called the police. Asked at trial about defendant's response, Ricky Staples testified: "[Defendant] said that they didn't want to go through the—all the red tape, you know. If it wasn't their truck in the first place, they didn't want to—you know, they was wanting to make sure before they called the cops."

Dudley telephoned the police. Officer Scott Lance was dispatched to the scene, arriving about 12:40 p.m. Ricky Staples told Lance what had occurred. Lance then talked to defendant and his companion, one William Johnson. They were standing between Ricky Staples' pickup and a 1987 Ford pickup registered to Johnson. Defendant and Johnson told Lance they were looking for the vehicle identification number on Staples' pickup because Johnson owned a similar pickup which had been stolen two to three weeks earlier in Springfield and they were trying to determine whether the vehicle identification number on Staples' pickup matched that of the stolen pickup. According to Lance, Johnson stated he had reported the theft two to three weeks earlier. Johnson supplied Lance a series of numbers that Johnson said were from the stolen pickup. Lance ran a computer check of those numbers and learned no such vehicle was on file, "no stolen, nothing, no title, no registration."

Ricky Staples pointed to Johnson and informed Lance that Johnson initially had a gun but that Johnson had placed it in Johnson's pickup before Lance arrived.

Lance looked in Johnson's pickup and saw the grip of a handgun protruding from beneath a newspaper on the seat on the driver's side. Lance retrieved the gun; its clip contained four rounds of ammunition.

Lance also noticed a "small prescription bottle" on the passenger seat. The bottle had a rubber band around it and the label was up so Lance could read it. Lance

walked from the driver's side of Johnson's pickup to the passenger side and, upon looking in, saw that the label on the bottle said: "Nitroglycerine 0.4mm. Turn in bottle for a refill." Lance noticed the label was from an Arizona pharmacy and there was no name on it identifying the person for whom the medicine was prescribed. According to Lance, the bottle "didn't look brand new."

Lance picked up the bottle and could see it contained several small packages which did not appear to be nitroglycerine. Three small pills in the bottom did, however, appear to be nitroglycerine.

Defendant and Johnson were behind Lance. Lance asked, "Who does this belong to?" Defendant responded that it was "his nitro," and that he had heart trouble.

Lance removed the bottle cap and looked inside, seeing several packages of "an off-white brownish substance."

Lance radioed the Webster County sheriff's office for assistance, then took defendant to Lance's patrol car. Inside the car Lance gave defendant the "Miranda Warning." [2] Lance showed defendant the bottle again and asked if it belonged to him. Defendant said yes. Lance reached inside the bottle, removed a small plastic packet containing the off-white substance, and asked defendant if he knew what it was. Defendant took the packet, smelled its contents, and stated it appeared to be "crank." At trial Lance explained that crank is the "street name" for methamphetamine.

Defendant told Lance he (defendant) did not know the crank was in the bottle, he thought there was only nitroglycerine. Lance asked defendant to again explain what he was doing in Ricky Staples' pickup. Defendant repeated his earlier explanation.

Lance finished talking to defendant, then began questioning Johnson. Sheriff Eugene Fraker of Webster County arrived during that phase of the investigation. After Lance finished talking to Johnson,

Lance told Fraker what Lance had learned and showed Fraker the handgun and bottle.

Lawrence Staples asked defendant how he had entered Ricky Staples' pickup. Defendant, in the presence of the Stapleses, Fraker and Lance, demonstrated how he had opened the "wing window," reached inside, rolled down the large window, removed the bolts from the inner panel of the door with an electric screwdriver, and tripped the lock. Lawrence Staples asked defendant why he had removed the ignition. Defendant responded that he was looking for the vehicle identification number.

At the conclusion of the investigation at the scene, Lance arrested defendant for the two crimes for which he was ultimately convicted. Lance arrested Johnson for attempted stealing.

Records of the Springfield Police Department established that on July 2, 1988, two days *after* the arrests, a lady identifying herself as "Mrs. William Johnson" telephoned Springfield police headquarters and reported "their" 1968 Ford Ranger had been stolen in Springfield. The caller stated the theft had occurred between June 1 and 23.

The handgun seized by Lance turned out to be registered to William Johnson's wife.

There were eight individual packets in the prescription bottle. Examination of them by a forensic chemist revealed that each contained methamphetamine.

The testimony of a Missouri State Highway Patrol sergeant specializing in motor vehicle theft investigations established there are no vehicle identification numbers on ignition switches in 1969 Fords. The sergeant's testimony also revealed that a motor vehicle can be started without a key if the ignition switch is removed. We decline to educate potential car thieves by repeating the sergeant's description of the technique.

Defendant filed a pretrial motion to suppress the prescription bottle and its con-

---

**2.** Presumably the ritual required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d     694 (1966).

tents on the ground that the seizure thereof was in violation of his rights under the Fourth Amendment to the Constitution of the United States and Article I, § 15 of the Constitution of Missouri. The motion averred that neither defendant nor Johnson consented to the search, that the search was conducted without a warrant, without probable cause, and that it was not within the scope of any exception to the warrant requirement.

The trial court conducted an evidentiary hearing on the motion. Officer Lance, presented by the prosecutor, was the only witness. He recounted that Johnson stated the 1987 Ford pickup belonged to him. Lance explained that upon being told by Ricky Staples that Johnson had put his handgun in his pickup prior to Lance's arrival, Lance went to the pickup to see whether in fact a pistol was there. Lance's testimony:

"... There were several citizens around in that area. I didn't know Mr. Thoms or Mr. Johnson or what their intentions were....

Q. At that time had you placed anybody under arrest or were you simply investigating?

A. I was just under—investigating at this time. No one had been arrested yet.

Q. And you went to the pickup then primarily to look for weapons?

A. Yes, for the weapon that had been mentioned."

Lance confirmed that he saw the prescription bottle while he was outside Johnson's pickup looking in, and that he read the label from that position. The absence of a person's name on the label made Lance suspicious, as all of his medications have his name on them. Once he reached inside and picked the bottle up he could see the small packets in it. A member of Lance's family uses nitroglycerine, thus Lance is familiar with nitroglycerine pills. He realized the packets did not appear to be nitroglycerine. Lance's testimony:

"Q. ... can you describe the packets that you saw?

A. Oh, they were less than an inch square packets; like a small zip-lock packet, a little, small bag. They might make it with a freezer bag maker or something like that.

Q. In your experience in law enforcement have you seen packets similar to that in the past?

A. Yes, I have.

Q. And used in what connection?

A. Usually contain controlled substances."

Lance conceded that neither Johnson nor defendant consented to the search of Johnson's pickup.

At the conclusion of the hearing the trial court denied the motion to suppress on the grounds that defendant had no standing to object to the search of Johnson's pickup and the items seized were in plain view.

■ Defendant acknowledges in his brief that before one can complain of a violation of the Fourth Amendment to the Constitution of the United States one must have a legitimate expectation of privacy in the place or thing searched. *State v. McCrary*, 621 S.W.2d 266, 272 (Mo. banc 1981). The same requirement applies to searches challenged under Article I, § 15 of the Constitution of Missouri. *Id.* at 273. There is a two-part test for determining whether an accused has a legitimate expectation of privacy in the place or thing searched. First, the accused must have an actual, subjective expectation of privacy in the place or thing searched; second, the expectation of privacy must be reasonable or legitimate. *Id.* at 272–73. The legitimacy or reasonableness of the expectation is measured by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society. *Id.* at 273.

■ The proponent of a motion to suppress has the burden of establishing that his own constitutional rights were violated by the challenged search or seizure. *State v. Lingar*, 726 S.W.2d 728, 735 (Mo. banc 1987), *cert. denied*, 484 U.S. 872, 108 S.Ct. 206, 98 L.Ed.2d 157 (1987).

In the wake of *McCrary* the following pertinent motor vehicle search cases have

been decided by the Missouri Court of Appeals.

*State v. Rellihan*, 662 S.W.2d 535 (Mo. App.1983). The accused, a passenger in an automobile driven by one Vanderpool and owned by Vanderpool's wife, was held to have no standing to object to the receipt in evidence of items taken from the automobile's trunk by law enforcement officers during a warrantless search, as a passenger normally has no expectation of privacy in the trunk of someone else's automobile. *Id.* at 542[4]. There was no showing that the accused had any property or possessory right or interest in the automobile. *Id.* at 542[5].

*State v. Overstreet*, 694 S.W.2d 491 (Mo. App.1985). The accused, accompanied by two male passengers, was driving an automobile matching a description of one in which three men who had robbed a female victim had left the crime scene. Law enforcement officers stopped the automobile, detained the occupants and conducted a warrantless search. The victim's purse was found in the automobile and was used as evidence against the accused over his objection. The appellate court held the accused made no claim that he had either an actual, subjective expectation of privacy in the automobile or that his expectation of privacy was legitimate. *Id.* at 494. The fact that he was the driver and, therefore, in possession of the automobile did not establish a sufficient interest in it to assert an expectation of privacy. *Id.*

*State v. McCabe*, 708 S.W.2d 288 (Mo. App.1986). The accused, a passenger in an automobile stopped by police, objected to the use in evidence of his wallet which was seized from the automobile after the police had impounded it. The appellate court noted that at the hearing on the accused's motion to suppress he made no claim of an expectation of privacy in the automobile or its contents. The opinion declared that a person who is aggrieved by an illegal search and seizure only through the introduction of physical evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed. *Id.* at 291. The accused was held to have no standing to challenge the search of the automobile. *Id.*

■ At no time in the instant case prior to the receipt in evidence of the prescription bottle and its contents did defendant assert a claim of expectation of privacy in Johnson's pickup, nor did defendant, up to that point, present any evidence to the trial court supporting such a claim.

In his brief defendant directs our attention to the testimony of his only witness, Edna Julia Vernon. Ms. Vernon testified that she and defendant had cohabited together almost 12 years and that on the evening of June 29, 1988, she drove defendant to Johnson's home because defendant and Johnson were going fishing the next day. That testimony, according to defendant's brief, demonstrates he had a legitimate expectation of privacy in Johnson's pickup when he placed his prescription bottle in it.

The first problem with that argument is that Ms. Vernon's testimony came long after the prescription bottle and its contents had been received in evidence. Defendant points to no evidence other than Ms. Vernon's testimony that arguably established a legitimate expectation of privacy by him in Johnson's pickup. At the time in the trial when the prosecutor offered the prescription bottle and its contents in evidence defendant had asserted no claim of legitimate expectation of privacy by him in Johnson's pickup and had presented no evidence to the trial court arguably supporting such a claim. Indeed, at that point no evidence had been presented to the trial court, either at the suppression hearing or during trial, that defendant had even been in Johnson's pickup.

■ However, even had defendant timely asserted such a claim and presented Ms. Vernon's testimony in support of it at the hearing on the motion to suppress, it would have been unavailing. At best Ms. Vernon's testimony would have supported only an inference that defendant, some time prior to entering Ricky Staples' pickup, had been a passenger in Johnson's pickup. Under *Rellihan, Overstreet* and *McCabe* that would have been insufficient to give defen-

dant standing to complain about the search of Johnson's pickup by Officer Lance during which he seized the prescription bottle.

Defendant's claim of error is denied and the judgment is affirmed.

GREENE and PREWITT, JJ., concur.